MUTUAL LIFE INS. CO. (YOUNG v.). See Case No. 18,168.

# Case No. 9,981.

MUTUAL SAFETY INS. CO. et al. v. CARGO OF THE GEORGE et al.

[Olc. 89; 8 Law Rep. 361; 3 N. Y. Leg. Obs. 260.] [1]

District Court, S. D. New York. April, 1845.

MARINE INSURANCE — PROPERTY ACQUIRED BY ABANDONMENT—SPES RECUPERANDI—RIGHTS OF ASSURED — GENERAL AVERAGE — VOLUNTARY STRANDING TO SAVE CARGO — JURISDICTION — LOCAL LAW.

1. Assurers acquire by abandonment to them of property insured and satisfaction of their policies, all the present rights and remedies of the assured thereto, together with the spes recuperandi.

[Cited in The Manitoba, 30 Fed. 131.]

2. Those rights and remedies may be presented or proceeded upon in admiralty courts, by the assurers, in their own names.

[Cited in The Sarah J. Weed, Case No. 12,-350.]

[See Amazon Ins. Co. v. The Iron Mountain, Case No. 270.]

---

[1] [Reported by Edward R. Olcott, Esq. 8 Law Rep. 361, and 3 N. Y. Leg. Obs. 260, contain only partial reports.]

3. Parties may have, in this court, the same remedies against the proceeds of property, subject to its jurisdiction, that they are entitled to against the property itself, in whose hands soever the proceeds may be found.
[Cited in U. S. v. Mackoy, Case No. 15,696.]

4. Admiralty has jurisdiction of cases of general average upon losses at sea.
[Cited in The Congress, Case No. 3,099; The Hyperion's Cargo, Id. 6,987.]

5. The voluntary stranding of a vessel, in peril of loss, with a view to save the cargo, although the vessel be thereby totally lost, is ground for general average, and the ship and freight, in such case, are subjects of average contribution.
[Cited in Heye v. North German Lloyd, 33 Fed. 63.]

6. The federal courts are governed, in commercial and maritime cases, by the general, and not by the local law.
[Cited in Faulkner v. Hart, 82 N. Y. 418.]

7. The adjustment of average in case of sale of the goods at the place of disaster, before reaching the port of destination, may be in relation to the sale price.

8. When no sale is made at such place, the value, at the place of shipment, will govern.

9. The policies do not, of themselves, supply proof of the value of ship, cargo or freight, on general average. But the adjusters can receive the policies as auxiliary evidence of those values.

10. Invoices and bills of lading are competent evidence of the value of the cargo at the place of its purchase and shipment.

The cargo and its proceeds are libelled in this action by three insurance companies [the Mutual Safety Insurance Company, the American Insurance Company, and the Jackson Marine Insurance Company], underwriters on ship and freight, to recover a contribution share on general average, claimed to be payable by the cargo on board the ship George, because of a voluntary stranding of the vessel by her master to save the cargo and freight. The underwriters had accepted the abandonment of the ship and freight after the loss of the ship, and paid a total loss on the vessel and freight. The facts are as follows: The George, being insured by the libellants, (all the three companies having underwritten the vessel to the valued amount of twelve thousand dollars, four thousand dollars each, and the Mutual Safety Insurance Company having underwritten the freight to the amount of $4,400, on a valuation of $6,800,) sailed in May, 1841, from New Orleans to Trieste, with a cargo of cotton, consigned to the claimants, Reyea & Schlick. When about six days out, the vessel met with heavy weather, and sprung a leak. The leak increased, and the master, after making a fruitless attempt to reach the harbor of Nassau, finally, with the view to save the cargo from destruction, ran the ship on a reef, about three-quarters of a mile from the main land on the west end of the Grand Bahamas. The vessel and freight were wholly lost, and after abandonment to the underwriters, a total loss was paid by them. A large portion of the cotton was saved, and the proceeds came to the hands of the defendants, [Josiah] Macy & Son, as agents of Reyea & Schlick, and Livingston & Barclay. The libel was now filed in rem against the cargo and its proceeds, on the ground that they were bound to contribute in general average to the loss of the vessel and freight, and in personam against the respondents, as holders of those proceeds or parts of the cargo. A foreign attachment was prayed against the defendants, Reyea & Schlick, and Livingston & Barclay, to make them personally liable for the funds in their hands, and also to compel the appearance of the owners of the cargo. There was very little dispute as to the facts of the case. The answer of Barclay & Livingston, the agents of Reyea & Schlick, insisted that the vessel was run on shore to save the lives of the master and the crew, and that the most expedient course had not been pursued in running the vessel on shore. The answer of J. Macy & Son admitted the proceeds of cargo to be in their hands, and disclaimed all personal interest in the subject matter. The only witness examined on the hearing was Thos. S. Minott, master of the George. He testified that the vessel sprung a leak soon after leaving New Orleans, and between the 17th and 22d of May the leak had averaged from two hundred to twelve hundred strokes of the pump per hour; that the water was four feet in the hold, and increasing, when he determined, on the 28th, to run the vessel ashore. The wind was light, with little sea. He testified positively that he ran the vessel ashore to save vessel and cargo, and that he did not consider any life on board in danger, as they had good boats, and the weather was moderate. That if the cargo had been thrown overboard, the leak might have been stopped, if it was in the upper works, but he did not know where it was. That he thought there was a chance, although a small one, of keeping the vessel free, even without running her ashore or throwing over cargo. That he selected the place of running her ashore with the view and in the hope of saving both ship and cargo. An average statement had been made up by an adjuster, and was submitted to the court by the libellants as the basis of the decree demanded.

Theodore Sedgwick, for libellants.

2 [I. This libel is filed by insurers on a vessel voluntarily stranded for the benefit of all concerned, and her freight on which a total loss has been paid, to subject the cargo to a contribution in general average. Columbian Ins. Co. v. Ashby, 13 Pet. [38 U. S.] 331. The ship George, in May, 1841, being at sea was found leaking, and could not be kept free

2 [From 3 N. Y. Leg. Obs. 260.]

by the pumps. The condition of the vessel was not desperate, but no attempt could be made to stop the leak without throwing the cargo overboard, and as it was more valuable than the vessel, the captain thought it most for the benefit of all concerned to run the vessel ashore. The cargo was thus saved—the vessel lost. II. By reason of the voluntary stranding, and sacrifice of the vessel and freight for the general benefit, the cargo became liable to the owners of the ship for a contribution in the nature of general average. III. The owners of the vessel and freight, being insured by the libellants, made abandonment and received payment of a total loss. The general average contribution is, therefore, due to the libellants. IV. The claim is founded on the implied maritime contract by which the vessel and cargo are reciprocally bound to each other to contribute to all sacrifices made for the common benefit of that contract—this court has of course jurisdiction. V. The court can either order a reference to the clerk to adjust the account or act definitely on the average statement already made, if no errors are shown to exist in it. VI. The admiralty has jurisdiction of a question of general average. 2 Phil. Ins. 580; Browne, Civ. & Adm. Law; De Lovio v. Boit [supra]. VII. The master has a lien on the cargo for its share of contribution towards a general average. Curt. Merch. Seam. 217; Abb. Shipp. pt. 3, c. 8, § 17; Simonds v. White, 2 Barn. & C. 805; Scaife v. Tobin, 3 Barn. & Adol. 523; The Hoffnung, 6 C. Rob. Adm. 383; Stev. Av. p. 50; U. S. v. Wilder [Case No. 16,694]. VIII. The doctrine that the admiralty has no jurisdiction over accounts, means accounts in the original sense of the term, i. e. disputed merchants accounts. Dunl. Adm. Prac. p. 16; Ordinance of 1648. "The court of admiralty shall not hold pleas or admit actions upon any bills of exchange, or accounts betwixt merchants and merchants or their factors." The John, 3 C. Rob. Adm. 288; (Am. Ed.) 234. "The account is of too general and unsettled a nature to entitle the party to this remedy." Dunl. Adm. Prac. p. 29. "A copartner or part owner of a ship cannot institute a suit for accounts in the admiralty in England." IX. The result is, that this court has jurisdiction of the case, both as one of maritime contract, and one of maritime lien, and that it does not come within the exception of disputed merchant's accounts.

[Danl. Lord, Jr., for respondents.

[I. The libellants are mere assignees of a chose in action, and as such, cannot sue in admiralty. II. The vessel being a maritime vessel, the underwriters residing in New York, the ship bound for Louisiana, to Austria, and the respondents being citizens of the latter country, there is no sufficient evidence that, either by the laws of Maine, New York, Louisiana, Austria or England. general average is due in a case like this. We insist, that in New York, where the contract was made, it is settled in a similar case, that no contribution in the nature of a general average is due. Bradhurst v. Columbian Ins. Co., 9 Johns. 9; 1 Parke, Ins. 280, c. 7; 2 Phil. Ins. "Gen. Average," 102. III. Even if a general average contribution were due, the court of admiralty has no jurisdiction to state the account between the parties. 2 Hagg. Adm.; 3 C. Rob. Adm. 288. IV. If any average were due, and this court is competent to make it, Bermuda is the proper place of adjustment, and there is no evidence of the law there. The learned counsel commented at length on the statement which had been made; citing 2 Phil. Ins. 141-167.

[BETTS, District Judge. The undersigners, by the abandonment, became clothed with all the rights of the insured, in respect to contribution in general average. 2 Phil. Ins. 322. The cargo is bound to the vessel to satisfy such contribution, and courts of admiralty will enforce the lien, it being of a maritime character. The proceeds of cargo may be pursued by libel or petition to recover general average. Stev. Av. 25; Dunl. Adm. Prac. p. 57; 4 Wash. 99, 100. As a general rule, when admiralty has jurisdiction in rem, or over the subject matter, it can be exercised against whatever represents the thing, or to which it may be changed or converted; and is exercised by monition, &c., against those who hold the proceeds. [Sheppard v. Taylor] 5 Pet. [30 U. S.] 675. The voluntary stranding of a vessel by the master, to save the cargo, is ground for a general average, although the vessel be totally lost. Abb. Shipp. 349, note 1; 3 Wash. C. C. 398; [Columbian Ins. Co. v. Ashby] 13 Pet. [38 U. S.] 331. The rule adopted by the state court (9 Johns. 9) does not control here. In commercial and maritime cases, the United States courts are not governed by the local law, but administer the general law. [Swift v. Tyson] 16 Pet. [41 U. S.] 1. The owners of the ship so lost are entitled to contribution on the freight as well as the cargo. [Columbian Ins. Co. v. Ashby] 13 Pet. [38 U. S.] 344. The adjustment of average, in case of sale of the goods at the place of disaster, and before reaching the port of destination, may be in relation to the sale price. Ben. Ins. 289. General rule of adjustment is explained. Stev. Av. 122, 167; 3 Kent, Comm. 343; Abb. Shipp. 3677.] [2]

BETTS, District Judge. The main subjects of controversy in this case are: The competency of this court to entertain the action; the right of the ship-owners to compensation on general average; and the principles upon which the average contribution shall be adjusted and distributed. The ship was totally

---

[2] [From 3 N. Y. Leg. Obs. 260.]

lost and was abandoned to the underwriters, who are the libellants in the action by virtue of that title. The abandonment conferred on them every interest and right in the ship possessed by her owners. They take all title and authority of the assured, even the spes recuperandi; his agents become theirs, and they stand subrogated to every privilege and power he possessed and might legally exercise. 2 Cond. Marsh. 601ab; 2 Phil. Ins. 420; [Chesapeake Ins. Co. v. Stark] 6 Cranch [10 U. S.] 268; Jumel v. Marine Ins. Co., 7 Johns. 412. If this complete substitution of the assurers in the place of the assured should fail to confer also the capacity to sue at law in their own names, they would meet no such technical impediment in this court; an assignee of an interest may maintain an action upon his title as if originally vested in him. It accordingly presents no objection to the sufficiency of parties that the libellants sue in their own names or solely. The objection to the jurisdiction of this court over the subject of general average was earnestly pressed on the argument. No case, however, was produced in the American or English maritime courts, in which the jurisdiction has been disavowed; and upon the criterion by which the capacity of the court is determined, general average would seem to be a subject eminently adapted to its functions, and to be made up of those ingredients which constitute a maritime jurisdiction and require its exercise. If not strictly international, it is cosmopolite in character, useful to the navigation of all nations, and everywhere recognized as an essential accompaniment of maritime commerce. Its necessity is created by transactions at sea, and relates to the exigencies and liabilities of ships, cargoes and freights reciprocally to each other at sea, in respect to maritime disasters, in which the exposure is common to each, and especially when it happens that some interest is, wholly or in part, voluntarily sacrificed for the preservation of the others. The rights springing out of that condition are recognized instinctively or by natural reason, and the primitive sea laws acted upon those rights, as subjects appropriate to their cognizance and authority. The civil law gave body and system to the usages and customs which had before prevailed in place of primitive law, and with the simplicity and practical equity which pervaded that polity, dealt directly with the property benefited or prejudiced by the sacrifice, and distributed between the two that which remained after the disaster in such ratio as to render the loss a mutual one to the owners of ship, cargo and freight, undergoing the common peril. The master of the ship became, in his official capacity, the minister of the law, who arrested and detained the property remaining, determined the amount of loss and the scale of contribution to be made and received by the respective portions of it, and carried the decision into effect by his own authority. The practical procedure in accomplishing this end is subject to regulation by the governments to which the vessels belong, but all the elements and gist of a general average, as recognized in its inception, and now administered by commercial nations, are maritime in their origin and nature, and appertain to the functions of maritime tribunals. This was the understanding of the law by the old English civilians. Zouch says, "Admiralty courts have jurisdiction touching contributions to be made for loss upon occasions of common danger." Zouch, Adm. assertion 3, art. 4, p. 32. Godolphin enumerates carefully the subjects over which the admiralty courts had a clear jurisdiction, and says, "Within the cognizance of this jurisdiction are all affairs at sea immediately relating to vessels of trade and the owners thereof"; also, "all cases of jactus, or casting goods overboard." Chapter 4, pp. 44, 169. Alexander, justice, in a treatise upon the sea laws, published in London, 1705, reiterates this declaration, and commends Godolphin as an eminent and reliable authority upon the subject of admiralty jurisdiction. Sea Laws, 259. The more modern elementary writers evidently hold the same sentiments, although expressed with a perceptible dread of the despotism of writs of prohibition. Browne says, "If a party institute a suit in admiralty in a cause of average and contribution, and be not prohibited, I do not see how the court could refuse to entertain it." 2 Browne, Civ. & Adm. Law, 122. When objection was made to the authority of the court to award average contribution, Sir William Scott yielded to the objections, but on two special grounds, first, that the claim was one of prize against a ship by captors of the cargo as prize of war. The cargo would have been entitled to average contribution as between its owner, and the owner of the ship. A part of it had been applied to repair the vessel before her capture. She was restored by the court. The court held, that as a prize court, it could not take notice of a contributory liability of property, expended for the benefit of the ship, and that, though cases of average on the part of the ship against the cargo are not unfrequent, a demand of the cargo against the ship is perfectly novel. The Hoffnung, 6 C. Rob. Adm. 383. No intimation is given by the court that it had no jurisdiction in cases of average. Its remarks strongly imply the contrary. In The Gratitudine, 3 C. Rob. Adm. 255, the implication is direct and forcible that cases of contribution are properly within the jurisdiction of the admiralty. Mr. Abbott refers to the civil law as the source of the authority for enforcing average contribution (Abb. Shipp. 361, § 17), and its procedures were in rem, and belong now only to courts of admiralty. The doctrine of the American courts is clear and distinct on this subject. Judge Story, in his thorough and profound discussion of the jurisdiction of the courts, says, "It embraces contracts and quasi contracts respecting average contributions." De Lovio v. Boit [supra]. In U. S. v. Wilder he

says, "The general maritime law enforces a contribution in default of any notion of a contract upon the ground of justice and equity, and is the only mode of remedy in many cases." Case No. 16,694. See, also, The Packet [Id. 10,654]. The practice is familiar to the courts. Dunlap, Prac. 57. It seems peculiarly fitting the functions of the court, no other tribunal having the faculty to compel property made liable to contribution by the maritime law, to fulfil that obligation.

A suit at law or in equity may be employed to obtain the value of the contribution (1 Smith, Merc. Law, 192; 1 Law Lib. (N. S.) 115; 1 Story, Eq. § 490); but the proceedings can only be in personam at law, helped out by the fiction of a contract (3 Chit. Pl. 87, 88), where none subsists in fact. And the interposition of equity affords no specific relief against the property, and is invoked rather to bring suitable parties into the controversy than to effectuate, by its direct action, the remedy the case requires. It will not even restrain the master from parting with the goods, if he thinks proper to do so. The civil law supplies the only forum adequate to the full necessities of the remedy. Abb. Shipp. (Ed. 1829) 361, 362, § 17. So, also, in my opinion, the parties entitled to a contribution can enforce their right by appropriate proceedings against the proceeds of the property, subject to make contribution in average, in whosesoever hands those proceeds may be found; or against whatsoever represents that property; without regard to a continuing possession of the goods to which the right of lien or contribution attached. [Sheppard v. Taylor] 5 Pet. [30 U. S.] 675; Harris v. Lindsay [Case No. 6,123]; [Ramsay v. Allegre] 12 Wheat. [25 U. S.] 615; 11 Johns. 323; Dunl. Adm. Prac. 57; Stev. Av. 25. The owner, if a foreigner or non-resident, may be brought under the jurisdiction of this court by suits of foreign attachment, so that the proceedings will be as efficacious against him, as if the were under personal monition or arrest. Munro v. Almeida, 10 Wheat. [23 U. S.] 473.

The point most contested on the hearing is involved in the objection that the ship-owner is not entitled to bring the value of the ship into contribution on general average, when the peril to which she was voluntarily exposed resulted in her total loss and destruction. The facts of the case are free from all conflict, and upon the testimony of the master, it appears the vessel was voluntarily run ashore by him to save the cargo, the lives on board not being in danger, and was totally lost in consequence. The policy and justness of the rule which, in my opinion, warrants this demand, is clearly manifested by these facts, because, if the probable or even possible destruction of the ship might follow the act, the master would have no inducement to risk that sacrifice, if, when the total loss followed, no claim for indemnity could be maintained against the cargo and freight for whose benefit it was made. In this act are all the requisites to a case of general average. The exposure of the ship to loss was voluntarily made by the master and crew for the common benefit of the shippers, and solely for the purpose of saving the cargo. It conduced to their preservation. The controlling test in questions of average is the voluntary placing of part of the property in peril by the master and crew, for the safety of the residue. 2 Browne, Civ. & Adm. Law, 199; Whitteridge v. Norris, 6 Mass. 125. And in vindication of the soundness of the new rule, admitted in the American courts, giving the value of the ship when she is totally lost a right to contribution, Ch. J. Tilghman, in Gray v. Waln, says, if the case is not one of general average, because the ship was totally lost, the result would be that for a small loss there shall be compensation, but a great loss is to go without compensation. 2 Serg. & R. 229.

To constitute a case of general average it is admitted to be essential that the ship and cargo should be in common danger, and that a part should be sacrificed for the preservation of the remainder, or, as is laid down by Emerigon (volume 1, 603), "le dommage n'est avaire grosse, que dans les cas ou il été opéré voluntairement pover le salut commerce." All these ingredients to a case of general average are proved to exist in the present instance, and it varies only from those described and approved in the earliest edicts and adjudications on the subject, in the feature, that the ship was subjected to a total instead of a partial loss, in the effort to save the cargo. This consideration augments the equity of the claim that such loss should be apportioned, and the property saved should contribute towards its remuneration. The argument against the claim attempts to replace the old doctrine declared by Emerigon and sanctioned by the supreme court of New York, excluding the owners of a ship totally lost from participation in the general average shared by the owners of cargo and freight. Bradhurst v. Columbian Ins. Co., 9 Johns. 9; Emerig. vol. 1, c. 12. § 13, p. 614. "It will be general average if the stranding has been voluntarily made for the common safety, provided, always, that the ship be again set afloat; for if the stranding be followed by shipwreck, then it is, save who can." To do this effectually, the effort is made to distinguish the facts and principles acted upon by the supreme court of the United States and other American tribunals, from the broad and direct proposition presented by this case. But in my judgment no sound distinction can be shown between them, and the scope and force of the reasoning and conclusions of the supreme court embrace and dispose of every material question made upon that point in the case. Judge Story, in speaking for the court (Columbian Ins. Co. v. Ashby, 13 Pet. [U. S.] 539): Surely, says he, the question of contribution cannot depend upon the amount of the damage sustained by the sacrifice, for that would be to say, that if

a man lost all his property for the common benefit, he should receive nothing; but if he lost a part only he should receive full compensation, and emphatically declares the law to be that a voluntary stranding of the ship, followed by a total loss of the ship, but with a saving of the cargo, constitute, when designed for the common safety, a clear case of general average. In this cardinal doctrine other influential decisions concur. The principle to be gathered from the new application of the rule is, that if the voluntary act of the master and crew is the direct occasion, the efficient motive and cause of the stranding, the loss becomes one of general average. Caze v. Reilly [Case No. 2,538]; 2 Browne, Civ. & Adm. Law, 199; Whitteridge v. Norris, 6 Mass. 125; Gray v. Waln. 2 Serg. & R. 229; Sims v. Gurney, 4 Bin. 513. The Rhodian law, whence the doctrine of contribution is derived, is founded upon this principle, jactus factus levandae navis gratia. The particular loss incurred is elected, with a view to the safety of what remains. 2 Cond. Marsh. 536. There is nothing in the adage of the Rhodian edict which imports that a partial injury of the property put in peril is all that is contemplated by the devotion of it to relieve the common peril; on the contrary, the larger doctrine has always been deduced from it, that as the jettison is unreserved, and may naturally result in the entire loss of the property abandoned to the risk, so the average remuneration shall correspond to and be measured by the degree of loss. Jac. Sea Laws, 345; Wesk. Ins. (Fol. Ed.) tit. "General Average, Jettison"; Abb. Shipp. (Ed. 1829) 348; 3 Kent. Comm. (3d Ed.) 232. This reference to the foundation of the law of general average is sufficient to indicate that the application of its rules and principles by the supreme court of this state (9 Johns. 9) is in restraint of the exalted and comprehensive equity it is designed to accomplish in cases of common perils wherein the property of one is sacrificed to promote the safety of others standing in equal exposure. Had the counsel then succeeded on this argument in raising a doubt whether the conclusions of the supreme court (13 Pet. [38 U. S.] 359) were in conformity with antecedent adjudications or usages on this subject, the doctrine of that decision supplies the more satisfactory exposition of this important branch of maritime law, and gives a rule eminently adapted to the exigencies of commercial navigation. Independent of this acquiescence in the soundness of the views of the court in that case, I should feel bound to conform to its expositions of the general principles and rules applicable to average claims, although the particular facts of this case may be shown not to be exactly coincident with those on which that judgment was founded. The leading feature of that case embodies the principle which controls this. But even if it could be demonstrated that the conclusions of the supreme court were speculative and hypothetical, the solemn enunciation and sanction of a rule of maritime law, by that high tribunal, would be a guide and light I should not fail to follow in the administration of that law in this court.

In commercial and maritime questions, the federal courts are not governed by the jurisprudence of particular states, but by the general principles and doctrines of commercial law, or the law-merchant. Swift v. Tyson, 16 Pet. [41 U. S.] 1. I shall, therefore, hold the libellants, representing the rights of the owners of the ship, as entitled to contributions on general average upon her value, at the place of loss, notwithstanding she was totally lost by the stranding. The act was voluntarily done by the master with a view to the safety of the cargo alone. They are entitled to contribution toward the loss, from all that was saved, including cargo and freight. The ship, cargo and freight are to be estimated at their full value, at the place of stranding. That value will be ascertained on the adjustment of the average by appropriate proof. The invoices and bills of lading will be received as evidence of the value of the cargo at the place of purchase and shipment, and the policies may be consulted as evidence conducing to prove the worth of the ship at the port of departure, and the value of the freight lost. 3 Kent. Comm. 167; Abb. Shipp. 607; 2 Cond. Marsh. 618. But additional evidence of the value must be produced. The principles governing the valuation between assured and assurers, are not conclusive in cases of average, because, in the first instance, the policy is the common act of the parties in interest, and may estop all question as to valuation, whilst on general average interests are brought in which are not controlled by the policy. Still I think the policies may be admissible before the adjusters as auxiliary proof of the value of the ship, cargo or freight. The decree will be drawn up in correspondence with this decision, and all questions of law which may properly be raised on the proceedings of the adjusters under it, may be brought forward for consideration on the coming in of the adjustment or auditor's report.

The following decree was adopted by the court and entered in the cause: This case having been heard upon the pleadings and proofs, and having been argued by Mr. Sedgwick for the libellants, and by Mr. Lord for the claimants, and due deliberation being had in the premises, it is considered by the court that the libellants are entitled to recover against the claimants and against the proceeds of the cargo owned by them, and saved from the wreck of the ship George, a contributory part in general average, in the proportion the value of the cargo saved bore to the cargo on board paying freight. And it is further considered by the court, that the libellants, for the purpose of such contribution, are entitled to have the ship and freight

valued at the sums respectively named in the policies in the pleadings mentioned, deducting, in respect to the ship, a reasonable allowance for wear and tear on the voyage up to the time of the disaster, and all sums received on sale thereof, or any part of her tackle or apparel at the place of wreck or elsewhere. And it is further considered by the court, that the goods of the claimants saved pay contribution according to the prices at which the same were sold at Nassau, (the place of the stranding,) deducting therefrom salvage and other necessary charges; and if it be found that such prices are below the average invoice prices of such goods, or the valuation thereof in the policies of insurance, that then the residue of the cargo paying freight be valued, for the purpose of adjusting the average contribution, at the same rate or proportion. And it is ordered by the court, that it be referred to the clerk, (or to an auditor to be named or designated by consent of the proctors of the respective parties,) to adjust and state the average contribution against the claimants, conformably to the principles of this decree, and that on such reference, the testimony used in this cause, and such other evidence as may be pertinent and competent, may be offered by either party, subject to all legal objections.

[For hearing on exceptions to the auditor's report, see Case No. 9,982.]